## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**LEROY C. BROWN,**

      **Plaintiff,**

**v.**                                                                 **Civil Action No. 1:13cv3**
                                                                       **Judge Keeley**

**BRANDI [sic] MILLER, Unit Manager;**
**KAREN PSZCZOLKOWSKI, Associate**
**Warden of Operations; JOANIE HILL,**
**Supervisor Two; GREG YAHNKE, Associate**
**Warden of Programs/Immediate Supervisor;**
**LT. EDWARD LITTELL, Fire & Safety;**
**EVELYN SEIFERT, Warden; DALE GRIFFITH,**
**Case Manager; CECELIA JENISZEWSKI,**
**Prime Care Medical Administrator; JAMES**
**RUBENSTEIN, Commissioner, Dep't. of**
**Corrections; and JOHN DOE or JANE DOE,**

      **Defendants.**

### REPORT AND RECOMMENDATION

On January 7, 2013, the *pro se* plaintiff, a prisoner presently incarcerated at the Northern

Correctional Facility ("NCF") in Moundsville, West Virginia, initiated this case by filing a civil

rights complaint against the above-named defendants pursuant to 42 U.S.C. § 1983. The plaintiff

was granted permission to proceed as a pauper on January 8, 2013, and paid the required filing

fee on January 22, 2013.[1] On January 28, 2013, the plaintiff filed a motion to amend, which was

granted by Order entered on January 30, 2013. Plaintiff filed his amended complaint on

February 22, 2013.

Accordingly, this case is before the undersigned for review, report and recommendation

pursuant to 28 U.S.C.§§ 1915(e), 1915A, and LR PL P 2.

### I.   Standard of Review

---

[1] Despite having been ordered to pay only an initial partial filing fee of $42.04, petitioner paid the entire fee.

1

Because the plaintiff is a prisoner seeking redress from a governmental entity or employee, the Court must review the complaint to determine whether it is frivolous or malicious. Pursuant to 28 U.S.C. § 1915A(b), the Court is required to perform a judicial review of certain suits brought by prisoners and must dismiss a case at any time if the Court determines that the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief against a defendant who is immune from such relief.

A complaint is frivolous if it is without arguable merit either in law or in fact. Neitzke v. Williams, 490 U.S. 319, 325 (1989). However, the Court must read *pro se* allegations in a liberal fashion. Haines v. Kerner, 404 U.S. 519, 520 (1972). A complaint which fails to state a claim under Fed.R.Civ.P. 12(b)(6) is not automatically frivolous. See Neitzke at 328. Frivolity dismissals should only be ordered when the legal theories are "indisputably meritless,"[2] or when the claims rely on factual allegations which are "clearly baseless." Denton v. Hernandez, 504 U.S. 25, 32 (1992). This includes claims in which the plaintiff has little or no chance of success. See Estelle v. Gamble, 429 U.S. 97, 106 (1976).

## II. The Complaint

In the complaint, the plaintiff asserts that he was hired by the NCF as a D1-Pod Janitor from February 8, 2005 through September 18, 2012. (Dkt.# 1-3 at 63 and Dkt.# 1-3 at 85). As a Pod Janitor, among other things, the plaintiff was expected to clean the showers, using certain cleaning products and chemicals.

Plaintiff, who asserts that he only has one lung and suffers from chronic obstructive pulmonary disease ("COPD"), alleges the defendants wrongfully discriminated against him as a disabled individual under the Americans with Disabilities Act ("ADA"), and impliedly alleges

---

[2] Id. at 327.

that they conspired to and did retaliate against him for filing grievances, by terminating his janitorial position at the NCF.

 Alternatively, the plaintiff raises a deliberate indifference to serious medical needs claims against the defendants, for permitting said chemicals to remain in use within the facility if they are dangerous, especially to someone like himself with pulmonary issues.  Finally, the plaintiff raises a HIPAA violation allegation against two of the defendants.

Plaintiff alleges he filed grievances over the issues,[3] which the defendants either failed to properly respond to or ignored.

As relief, the plaintiff seeks to be reimbursed in the amount of $600.00 to cover his costs in filing this case; "punitive damages" of $225,000.00 to compensate him for his pain, mental and emotional stress; and injunctive relief in the form of reinstatement to his former position at the same pay, including back pay for the time since he was removed from the position.  Further, he requests that rules be established regarding the uses and risks of chemicals used in the facility; chemical charts be posted; eyewash stations be installed on each pod; adequate ventilation be installed in all chemical cabinets; and to have "all chemicals that was use [sic] to take Plaintiff job [sic] to be remove [sic] from this institution."  Finally, he seeks to have policies established at the NCF, requiring the position of Unit Manager to be filled with a licensed counselor who would prohibit discrimination against inmates based on their disabilities.

On August 30, 2012, the plaintiff filed Grievance No. 12-NCC-D1-226 with his Unit Manager, defendant Brandi[4] [sic] Miller ("Miller"), questioning why another inmate's position

---

[3] Plaintiff does not contend he has exhausted his administrative remedies but it appears from the record that he has done so.

[4] The spelling of defendant Miller's first name is apparently "Brandy," not "Brandi," as evidenced by her signature on one of plaintiff's grievances.  Dkt.# 1-2 at 14.

as a janitor on the D1-Pod cleaning showers was not filled after that inmate was reassigned to a different job elsewhere at the jail. In his grievance, he stated "I have been doing this cleaning of showers extra of my own job. **I am not able to do extra because of health matters**. I have to clean offices at the top tier and do supplies among other jobs . . . When is Joanie Hill going to hire another shower worker for D1-Pod?" (Dkt.# 1-2 at 3-4)(emphasis added). The grievance was denied on September 10, 2012, by defendant Karen Pszczolkowski ("Pszczolkowski"), Associate Warden of Operations, who advised plaintiff, in pertinent part, that

> I . . . was performing the duties of the Work Assignment Coordinator. Policy Directive 500.00 was complied with in filling the position. It is not up to you to determine when and how these job assignments are made. Your job assignment states on it "if assistance is needed on another job you are expected to work as directed by your supervisor." If you don't want to assist, you can resign from your job assignment. Furthermore, I am unaware of any medical issues which would preclude you from performing your duties. You are currently assigned as a Pod Janitor/D1 and Precautionary. If you're having health issues then you need to submit a nurse sick call slip and be evaluated in regards to your job duties.

(Dkt.# 1-2 at 5). Apparently unsatisfied with the response, plaintiff filed a Level Two Grievance with the warden/administrator, where it was affirmed on September 14, 2012, by defendant Warden Evelyn Seifert ("Seifert"). (Dkt.# 1-2 at 3). Plaintiff appealed the Level Two decision to the Commissioner of the Division of Corrections on September 18, 2012, where it was later affirmed. (Dkt.# 1-2 at 1).

On September 16, 2012, plaintiff was examined in medical and directed to avoid chemicals; refrain from lifting anything over ten pounds; and to take frequent rest periods while working to decrease his shortness of breath. (Dkt. 1-3 at 1). Accordingly, plaintiff was terminated from his job as a janitor, because chemical use was an intrinsic part of the job. (Dkt.# 1-2 at 6).

On September 18, 2012, plaintiff filed Grievance No. 12-NCC-D1-247, complaining that Pszczolkowski discriminated against him because of his "health disability" by terminating him from his job. (Dkt.# 1-2 at 7). His grievance was denied by defendant Case Manager Dale Griffith ("Griffith") on October 3, 2012, because the medical restrictions placed upon him precluded his exposure to chemicals. (Dkt. 1-2 at 6). Apparently unsatisfied with the response, plaintiff filed a Level Two Grievance with the warden, where it was affirmed and again denied on October 11, 2012 by Seifert. He appealed the Level Two decision to the Commissioner of the Division of Corrections on October 11, 2012, where it was later affirmed. (Dkt.# 1-2 at 6).

Plaintiff filed Grievance No. 12-NCC-D1-250 on September 20, 2012, complaining that "[i]f the chemicals we have inside this institution are so dangerous and hazardous to my health WHY all theses [sic] years you let me work with theses [sic] kind [sic] of Chemicals [sic] knowing that I got (COPD) and theses [sic] kind of chemicals could have kill [sic] me, by exposing me to such chemicals." (Dkt.# 1-2 at 9). Plaintiff argued that "[w]hich right did you take from me, my Health [sic] from using dangerous and hazardous chemicals, or violate my rights because I file grievance [sic]?" (Id.). In response, on September 26, 2012, defendant Cecelia Jeniszewski ("Jeniszewski"), Administrator of Prime Care Medical, advised him that "[y]ou indicated on a Nurse Sick Call that you had trouble breathing due to the job. Masks were available to you. Medical did not take away your job, you were evaluated by medical. A Special Physician Order was issued with restrictions." (Dkt.# 1-2 at 8). Plaintiff filed a Level Two Grievance Form with the warden/administrator, where it was affirmed and again denied on October 19, 2012 by defendant Yahnke. He appealed the Level 2 decision to the Commissioner of the Division of Corrections, where it was again affirmed. (Dkt.# 1-2 at 8).

On October 2, 2012, plaintiff filed Grievance No. 12-NCC-D1-259, conceding that Jeniszewski admitted to him that Prime Care had not taken his job from him and that she had spoken with Pszczolkowski about his grievance, but complaining that the pod log book said that as of September 17, 2012, his job was on hold until further notice, but then the following day, the West Virginia Division of Corrections ("DOC") took his job from him. Plaintiff asserts that this demonstrates a "pattern of lies" and a decision to "cover up truths." (Dkt.# 1-2 at 11). In response, on October 10, 2012, defendant Pszczolkowski stated

Please be advised I am in receipt of your grievance dated 2 October 2012. **I did have you and Unit Team Member called to my office to discuss this grievance. Correctional Counselor II, Amanda Riser was present when you refused to discuss this grievance and stated you will take it to court**.

In response to your grievance, a special physician's order dated 16 September 2012 indicated you were to avoid chemicals, no lifting greater than 10 pounds, and the need for frequent rest periods to decrease shortness of breath when working. **Your job assignment as a Pod Janitor requires you to work with chemicals. Ms. Joanie Hill, Supervisor II and Work Assignment Coordinator, did explain to you that due to these restrictions you could no longer perform your job assignment duties. She did advise you would be paid for 30 days and then your job assignment would be terminated**.

Northern Correctional Facility's goal is to have as many inmates working in productive jobs as possible. **We are hoping in the 30 day time frame we will be able to find another job assignment that you will be capable of performing which will not have an adverse effect upon your health**.

**Even though you are uncooperative with us in dealing with this unfortunate situation, the staffing at NCF is continuing to attempt to resolve this issue**.

**On Friday, 5 October 2012, Ms. Hill did offer you a job assignment in the Library as the Video/Games person at the same rate of pay you were making in the Pod Janitor position. This position would not adversely affect your health. You turned the job down stating you can't read and write, you aren't literate enough and wouldn't want to mess it up.**

**Again, on Tuesday, 9 October 2012, Ms. Hill offered you a job assignment as a Laundry worker at the same rate of pay you were making in the Pod Janitor position. This position would not adversely affect your health. You**

**would be able to sit and fold clothes. You would be able to sit and fold clothes. You refused stating you would take the matter out to Court**.

(Dkt.# 1-2 at 12 – 13)(emphasis added).

Unsatisfied, plaintiff filed a Level Two Grievance with the warden on October 11, 2012, where it was affirmed on October 12, 2012, by Yahnke. He appealed the Level Two decision to the Commissioner of the Division of Corrections on October 15, 2012, where it was later affirmed. (Dkt.# 1-2 at 10).

On October 4, 2012, before even receiving the above response, plaintiff filed Grievance No. 12-NCC-D1-266, vehemently complaining about the timeliness of staff responses to his grievances; the loss of his job; duplicity on the part of D.O.C. staff with their "patterns of Lies [sic];" the D.O.C.'s discrimination against him for filing grievances or for his "Health Disability [sic];" and his perception that during the years he had worked as a janitor, the DOC permitted him to be exposed to hazardous chemicals "knowing the Chemicals will KILL me!" (Dkt.# 1-2 at 15). Further, plaintiff complained that two other inmate janitors with health issues were given other job assignments with "less work for the same salary that they was [sic] making on their old job assignment, and you never once offer [sic] it to me, which shows discrimination against me." (Id.). On October 10, 2012, defendant Miller responded, advising that "as there are [sic] more than one issue listed in this grievance, I am unsure as to what you want answered or whom to forward it to. Please be concise in regards to DOC, Prime Care, chemicals or discrimination allegations." (Dkt.# 1-2 at 14). Plaintiff filed a Level Two Grievance with the warden, where it was affirmed on October 11, 2012 by defendant Seifert. Plaintiff appealed the Level Two decision to the Commissioner of the Division of Corrections, where it was subsequently affirmed. (Dkt.# 1-2 at 14).

On October 9, 2012, plaintiff filed Grievance No. 12-NCC-D1-269, alleging that from 2005 – 2012, while performing his janitorial duties, he was exposed to "substantial risk of serious harm" from dangerous chemicals that he was never warned about; citing to various Material Safety Data Sheets ("MSDS") for the germicidal detergents and glass cleaning products used, in support of his arguments as to specific health risks he believed he had been exposed to; complaining that mist from the products in concentrated form can irritate the mucous membranes and respiratory tract, and/or raise a risk of flammability; the chemicals cabinet was not adequately ventilated to outside air "by law and under EPA;" and arguing that he was never advised to wear skin and eye protection while using the cleaning products. (Dkt.# 1-2 at 17). On October 16, 2012, defendant Hill responded, stating:

> Please be advised, I am in receipt of your grievance # 12-NCC-D1-269 concerning Dangerous Hazardous Chemicals. Due to HIPAA laws staff is not aware of your medical condition. If you were having difficulties with the chemicals it is your responsibility to inform your unit team. On 03 April 2012 you participated in the Portion Pac video training class, and at that time you did not raise any issues with your health or with the chemicals. All forms of chemicals utilized by inmate janitors are in diluted form. At no time has a chemical been distributed with a rating of two (2) or above, which would classify it as *hazardous, extreme danger or deadly.*
>
> According to the wording of your grievance, you have read the Material Safety Data Sheets (MSDS) for the chemicals located in the pod. In accordance with these MSDS, chemicals such as germicide recommend the use of gloves and goggles and this is clearly depicted on each of the germicidal bottles, i.e. picture of goggles and picture of gloves. In addition to this, all janitors are provided with yellow rubber gloves, and a pair of safety goggles is kept on each pod for janitor usage. The Portion Pac video clearly states anyone using the chemicals should read the MSDS.
>
> Concerning chemical cabinets ventilated to outside: this applies to chemical cabinets specifically designed for storing chemicals that would present a fire hazard. All chemicals stored on a pod have a zero (0) rating of *will not burn* according to the National Fire Protection Agency (NFPA) panel.

> I do not know why eyewash stations are not on the pod; however, there is water available on the pods in case of emergencies, i.e. showers, sinks, water closet, etc. . .
>
> Every issue stated in your grievance has been addressed. If you have any further questions or concerns, do not hesitate to have a member of your unit team contact me.

Dkt.# 1-2 at 18 – 19.

On October 18, 2012, plaintiff filed a Level Two Grievance with the warden; it was denied on October 19, 2012 by defendant Yahnke, who advised that "you have received training in the proper use of chemicals. Safety equipment (gloves, goggles, etc.) is available upon request." Undeterred, on October 22, 2012, plaintiff appealed the Level Two decision to the Commissioner of the Division of Corrections, where it was subsequently affirmed. (Dkt.# 1-2 at 16).

On October 13, 2012, plaintiff filed Grievance No. 12-NCC-D1-274, identical in every respect to his Grievance No. 12-NCC-D1-250, filed on September 20, 2012, reiterating his claim that if the cleaning products used at the jail were so dangerous that he was removed from his job because of them, given his health issues, he should not have been permitted him to use them for so long, and asking "[w]hich right did you take from me, my Health [sic] from using dangerous and hazardous chemicals, or violate my rights because I file grievance [sic]?" (Dkt.# 1-2 at 21). On October 17, 2012, Hill denied his grievance because every issue in his grievance had already been responded to in prior grievance responses. (Dkt.# 1-2 at 22). Plaintiff filed a Level Two Grievance with the warden on October 22, 2012; it was affirmed on October 23, 2012 by defendant Seifert. He appealed the Level Two decision to the Commissioner of the Division of Corrections on October 24, 2012; it was subsequently affirmed. (Dkt.# 1-2 at 20).

## II. Analysis

### A. Defendants James Rubenstein, Evelyn Seifert, and the John and Jane Doe Defendants

Liability under § 1983 is "personal, based upon each defendant's own constitutional violations." Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir. 2001)(internal citation omitted). Therefore, in order to establish liability under § 1983, the plaintiff must specify the acts taken by each defendant which violate his constitutional rights. See Wright v. Smith, 21 F.3d 496, 501 (2nd Cir. 1994); Colburn v. Upper Darby Township, 838 F.2d 663, 666 (3rd Cir. 1988). Some sort of personal involvement on the part of the defendant and a causal connection to the harm alleged must be shown. See Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986). *Respondeat superior* cannot form the basis of a claim for a violation of a constitutional right under § 1983. Rizzo v. Good, 423 U.S. 362 (1976).

With respect to defendants Rubenstein and Seifert, despite plaintiff's naming them in both their individual and official capacities, plaintiff asserts no personal involvement on the part of either defendant in the alleged violations of his constitutional rights. Instead, plaintiff merely asserts that they had supervisory authority over the alleged violators; they should have done something to prevent the alleged violations of the plaintiff's rights; and that they were "incompetent" for not granting his administrative remedies.

When a supervisor is not personally involved in the alleged wrongdoing, he may be liable under § 1983 if the subordinate acted pursuant to an official policy or custom for which he is responsible, see Fisher v. Washington Metropolitan Area Transit Authority, 690 Fed 2nd 1113 (4th Cir. 1982); Orum v. Haynes, 68 F.Supp.2d 726 (N.D.W.Va. 1999), or the following elements are met: "(1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a 'pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offense or practices,' and (3) there was an affirmative causal link between the supervisors inaction and the particular constitutional injuries

suffered by the plaintiff." <u>Shaw v. Stroud</u>, 13 F.3d 791, 799 (4th Cir. 1994), cert. denied, 513 U.S. 813 (1994).

"Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm or constitutional injury." <u>Id</u>. "A plaintiff may establish deliberate indifference by demonstrating a supervisor's continued inaction in the face of documented widespread abuses.'" <u>Id</u>.

Here, plaintiff has not provided any evidence that defendants Rubenstein and Seifert tacitly authorized or were indifferent to an alleged violation of his constitutional rights. Instead, it appears that Rubenstein and Seifert simply failed to grant the plaintiff relief he sought during the administrative remedy process. However, an administrator's participation in the administrative remedy process is not the type of personal involvement required to state a claim under § 1983. <u>See</u> <u>Paige v. Kupec</u>, 2003 WL 23274357 *1 (D.Md. March 31, 2003). Rather, such participation establishes, at best, that Rubenstein and Seifert acted in their official capacities as the Commissioner of the WVDOC and the Warden of the NCF, respectively. However, official capacity claims "generally represent only another way of pleading an action against an entity of which an officer is an agent." <u>Kentucky v. Graham</u>, 473 U.S. 159, 165 (1985) (citation and quotations omitted). Therefore, suits against state officials in their official capacities should be treated as suits against the state. <u>Id.</u> at 166. In order for the governmental entity to be a proper party of interest, the entity's policy or custom must have played a part in the violation. <u>Id.</u> (citing <u>Monell v. New York City Dept. of Social Services</u>, 436 U.S. 658, 694 (1978)). In this case, the plaintiff fails to assert that a policy or custom of the entity played a part in the alleged violation of his constitutional rights.

With respect to the John and/or Jane Doe defendants, plaintiff's complaint merely lists them as John Doe and Jane Doe; makes no attempt to describe or identify them in any way; does not provide an address for them; and does not state what their positions were at the jail. Further, nowhere in the complaint does plaintiff allege what they did or failed to do that violated his constitutional rights. As stated *supra,* in order to establish liability under § 1983, a plaintiff must specify the acts taken by each defendant which violate his constitutional rights. <u>Wright v. Smith</u>, *supra* at 501.

Accordingly, the plaintiff cannot maintain this case against defendants Rubenstein, Seifert, and the John and/or Jane Doe defendants, and thus those defendants should be dismissed from this action.

**B.** **<u>The Plaintiff's Retaliation Claims</u>**

Although nowhere in the body of his complaint does the plaintiff actually assert that any particular defendant retaliated against him, the copies of administrative remedies he attaches to his original complaint repeatedly allege that the D.O.C. or its staff retaliated against him for filing administrative grievances, by mishandling the grievances, terminating him from his job, or continuing to expose him to chemicals. Plaintiff does, however, specifically allege that many of the defendants mishandled his grievances or were "incompetent" or "unqualified" in their handling of them.

**1.** **<u>Defendants Brandi [sic] Miller, Greg Yahnke, Dale Griffith, Joanie Hill, Karen Pszczolkowski, and Lt. Edward Littell</u>**

Plaintiff asserts that defendants Miller, Yahnke, Griffith, Hill, Pszczolkowski and Littell should have resolved his grievances at their respective levels, but instead passed off their responsibilities to do so, and thereby "evaded doing their jobs." He alleges that defendant Yahnke, as defendant Miller's immediate supervisor, had the authority to remove defendant

Miller, but did not, when she failed to resolve his grievances at the initial level. He contends his constitutional rights were violated by the defendants' failure to adequately perform their duties in this regard.

In order to sustain a claim based on retaliation, a plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." Adams v. Rice, 40 F.3d 72, 75 (4th Cir.1994). Therefore, *"in forma pauperis* plaintiffs who claim that their constitutional rights have been violated by official retaliation must present more than naked conclusory allegations of reprisal to survive [§ 1915(e)(2)(B) ]." Id. Furthermore, claims of retaliation are treated with skepticism in the prison context. Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir.1996). Additionally, "a plaintiff alleging that government officials retaliated against her in violation of her constitutional rights must demonstrate, *inter alia,* that she suffered some adversity in response to her exercise of protected rights. " American Civil Liberties Union of Maryland, Inc. v. Wicomico County, Md., 999 F.2d 780, 785 (4th Cir. 1993).

However, inmates do not have a constitutional right to participate in grievance procedures. Adams, 40 F. 3d at 75. Thus, the plaintiff can state no retaliation claim regarding the filing of his grievances. Moreover, prisoners do not have a constitutional right to a particular occupation while incarcerated. Jackson v. Cain, 864 F.2d 1235, 1247 (5th Cir. 1989). The weight of the authority is that there is no constitutional right supporting any claim that a prisoner has a right to any job. See Tennant v. Rubenstein, 2011 WL 3812625 (N.D. W.Va. August 26, 2011)(inmate not entitled to bring suit for being "fired" from a prison library job); see also Williams v. Farrior, 334 F.Supp.2d 898 (E.D. Va. 2004)(no due process protection against the threatened loss of a prison job or facility placement for failure to comply with the Inmate

Financial Responsibility Program requirements). "The Constitution does not create a property or liberty interest in prison employment and any such interest must be created by state law by language of an unmistakable mandatory character." <u>Newsom v. Norris</u>, 888 F.2d 371, 374 (6th Cir. 1989); <u>See</u> <u>also</u> <u>Gill v. Mooney</u>, 824 F.2d 192 (2nd Cir. 1987)(no constitutional right to a prison job). Prison administrators may assign inmates jobs and wages at their sole discretion. <u>Altizer v. Paderick</u>, 569 F.2d 812 (4th Cir. 1978); <u>Chapman v. Plagement</u>, 417 F.Supp. 906 (W.D. Va. 1976). Because the Constitution and federal law do not create a property right for inmates in a job, likewise, they do not create a property right for inmates to earn wages. <u>Williams v. Meese</u>, 926 F.2d 994, 997 (10th Cir. 1991); <u>James v. Quinlan</u>, 866 F.2d 627, 629-30 (3rd Cir. 1989); <u>Garza v. Miller</u>, 688 F.2d 480, 485 (7th Cir. 1982). <u>See</u> <u>also</u> <u>Gill v. Mooney</u>, 824 F.2d 192, 194 (2nd Cir. 1987)(no constitutional right to a prison job); <u>Adams v. James</u>, 784, F.2d 1077, 1079 (11th Cir. 1986)(same); <u>Lyon v. Farrier</u>, 727 F.2d 766, 769 (8th Cir. 1984)(same); <u>Manning v. Lockhart</u>, 623 F.2d536, 538 (8th Cir. 1980); <u>Sigler v. Lowrie</u>, 404 F.2d 659 (8th Cir. 1968); <u>Woodall v. Partilla</u>, 581 F.Supp. 1066 (N.D. Ill. 1984); <u>Anderson v. Hascall</u>, 566 F.Supp. 1492, 1496 (D. Minn. 1983). Therefore, firing or reassigning an inmate would not be violative of the Constitution, and would likely be characterized as the mere exercise of institutional discretion. <u>Jones v. Soles</u>, 2001 U.S. Dist. LEXIS 19003 (N.D. Tex. 2001).

Moreover, there is no evidence in the record to show retaliation. To the contrary, the record reveals that upon the termination of plaintiff's position as a janitor, the defendants made every effort to cushion the blow: they provided him with thirty days' "severance" pay, and promptly offered him two other, much less strenuous jobs within the jail at the same rate of pay, a job in the Library as the Video/Games person, and a job in the laundry, sitting, folding clothes. However, plaintiff refused both, stating he was not "literate enough" for the library job and that

he "would take the matter out to Court." (Dkt.# 1-2 at 12 – 13). Finally, nothing in the record supports plaintiff's claim that the defendants failed to properly respond to or ignored his grievances; the record reveals quite the opposite.

Accordingly, because plaintiff cannot show that the defendants violated any right secured by the Constitution or laws of the United States by terminating his job or denying his grievances, he has failed to state a claim upon which relief can be granted.

## C.  Deliberate Indifference to Serious Medical Needs

In the complaint, the plaintiff asserts that defendant Lt. Edward Little ("Little"), in charge of fire and safety at the NCF, was incompetent for permitting the plaintiff to use dangerous chemicals, knowing that plaintiff had a health disability. Further, he alleges that defendant Hill permitted the the same chemicals "that look [sic] the plaintiff job over, still be allow inside the institution and still being use around the plaintiff on the pod and in the showers of D1-pod." (Dkt.# 15 at 17). The undersigned construes these allegations as stating a claim of deliberate indifference to serious medical needs.

To state a claim under the Eighth Amendment for ineffective medical assistance, the plaintiff must show that the defendant acted with deliberate indifference to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To succeed on an Eighth Amendment cruel and unusual punishment claim, a prisoner must prove: (1) that objectively the deprivation of a basic human need was "sufficiently serious," and (2) that subjectively the prison official acted with a "sufficiently culpable state of mind." Wilson v. Seiter, 501 U.S. 294, 298 (1991).

A serious medical condition is one that has been diagnosed by a physician as mandating treatment or that is so obvious that even a lay person would recognize the need for a doctor's attention. Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990), cert.

denied, 500 U.S. 956 (1991).  A medical condition is also serious if a delay in treatment causes a life-long handicap or permanent loss.  Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3rd Cir. 1987), cert. denied, 486 U.S. 1006 (1988).[5]

The subjective component of a cruel and unusual punishment claim is satisfied by showing that the prison official acted with deliberate indifference.  Wilson, 501 U.S. at 303.  A finding of deliberate indifference requires more than a showing of negligence.  Farmer v. Brennan, 511 U.S. 825, 835 (1994).  A prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837.  A prison official is not liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the fact gave rise was insubstantial of nonexistent."  Id. at 844.

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment, [or lack thereof], must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness."  Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990).  A mere disagreement between the inmate and the prison's medical staff as to the inmate's diagnosis or course of treatment does not support a claim of cruel and unusual punishment unless exceptional circumstances exist.  Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985).  A constitutional violation is established when "government officials show deliberate indifference to those medical needs which have been diagnosed as mandating treatment, conditions which obviously require medical attention,

_____

[5] The following are examples of what does or does not constitute a serious injury.  A rotator cuff injury is not a serious medical condition.  Webb v. Prison Health Services, 1997 WL 298403 (D. Kansas 1997). A foot condition involving a fracture fragment, bone cyst and degenerative arthritis is not sufficiently serious. Veloz v. New York, 35 F.Supp.2d 305, 312 (S.D.N.Y. 1999).  Conversely, a broken jaw is a serious medical condition.  Brice v. Virginia Beach Correctional Center, 58 F. 3d 101 (4th Cir. 1995); a detached retina is a serious medical condition.  Browning v. Snead, 886 F. Supp. 547 (S.D. W. Va. 1995). And, arthritis is a serious medical condition because the condition causes chronic pain and affects the prisoner's daily activities.  Finley v. Trent, 955 F. Supp. 642 (N.D. W.Va. 1997).

conditions which significantly affect an individual's daily life activities, or conditions which cause pain, discomfort or a threat to good health." See Morales Feliciano v. Calderon Serra, 300 F.Supp.2d 321, 341 (D.P.R. 2004) (citing Brock v. Wright, 315 F.3d 158, 162 (2nd Cir. 2003)).

Here, plaintiff's claims against defendants Littell and Hill for deliberate indifference must fail. There is nothing in the record to support plaintiff's claim that either Littell and Hill or any other defendant deliberately endangered his health by exposing him to "dangerous" chemicals without his knowledge. To the contrary, the response to plaintiff's Grievance No. 12-NCC-D1-269, attached to plaintiff's complaint indicates that plaintiff participated in an April 3, 2012, "Portion Pac video training class," clearly stated that anyone using the cleaning products should read their MSDS; plaintiff never raised any issue with his health or the cleaning chemicals when he viewed the video; all cleaning products provided to inmate janitors are in safe, dilute form; none were ever distributed for inmate use that were rated as "hazardous, extreme danger or deadly." Further, because plaintiff's own grievance admits that he read the MSDS for each of the cleaning products used, he could hardly have been unaware of the recommended protective equipment, because each product label also displayed pictures of goggles and/or gloves, sufficient warning even for an illiterate; janitors were provided with rubber gloves and safety goggles; and all chemicals stored on the pods had a "zero" fire rating of "will not burn." Moreover, nowhere does plaintiff allege that he was ever denied medical care; his own medical records, attached to his complaint, show that he received regular and timely treatment for numerous health issues, including his pulmonary problems.

Accordingly, nothing in the record or in the plaintiff's complaint establishes any facts sufficient to support a finding that defendants Littell or Hill were deliberately indifferent to his

medical needs, and accordingly, the plaintiff's complaint as it relates to these defendants should be dismissed for failure to state a claim.

## D.  **Conspiracy**

In the copies of grievances attached to his complaint, plaintiff impliedly asserts that the DOC, through its staff, who he does not specifically name, conspired to retaliate against him for the filing of grievances.  However, to establish a civil conspiracy, a plaintiff must prove that two or more persons acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in the plaintiff's deprivation of a constitutional right.  Hinkle v. City of Clarksburg, WV, 81 F.3d 416 (4th Cir. 1996).  Moreover, the plaintiff has a "weighty burden to establish a civil rights conspiracy."  Id. at 421.  While the plaintiff does not need to "produce direct evidence of a meeting of the minds, [he] must come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective."  Id.  In this case, that means the plaintiff must produce evidence that at least leads to the inference that the defendants had a mutual agreement to retaliate against him.  Nevertheless, "mere speculation and conjecture will not suffice." Puglise v. Cobb County, 4 F.Supp.2d 1172, 1181 (N.D.Ga. 1998).

Here, the plaintiff provides no evidence which would lead to even an inference that the defendants had an agreement to retaliate against him.  At best, the plaintiff offers speculation and conjecture, which is not sufficient to state a claim for conspiracy.  Thus, the plaintiff has failed to establish that a civil conspiracy existed and his conspiracy claim should be dismissed.

## E.  **Plaintiffs' Claims Under the Americans with Disabilities Act**

Although this case arises under §1983, plaintiff also ostensibly raises claims under the ADA.  Specifically, Plaintiff asserts that the defendants Pszczolkowski, Hill and Griffith

discriminated against him under the ADA: Pszczolkowski by taking his janitorial job away after discovering his physical limitations from his medical conditions; Hill's discriminatory animus for permitting the same "dangerous" chemicals to remain in use at the facility after she became aware of plaintiff's disability; and defendant Griffith for being "unqualified to coordinate efforts to comply with responsibility defined by the [ADA]" and for not "taking up for" the plaintiff's disability in his response to plaintiff's grievance.

The ADA, as it applies to public entities, is codified at 42 U.S.C. § 12131, *et seq.* Further, it is recognized that the provisions of the ADA are applicable to prisoners confined in state correctional facilities. See PA Dept. of Corrections v. Yeskey, 524 U.S. 206 (1998). Despite that, the plaintiff fails to establish a prima facie case under the ADA.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." §12132 (2000 ed.). A "'qualified individual with a disability'" is defined as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." §12132 (2). The Act defines a "'public entity'" to include "any State or local government" and "any department, agency, . . . or other instrumentality of a State," §12132 (1). Title II authorizes suits by private citizens for money damages against public entities that violate §12132. See 42 U.S.C. §12133 (incorporating by reference 29 U.S.C. §794a).

To establish a prime facie case under Title II of the ADA, plaintiff must show: (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of his disability. See Race v. Toledo-Davila, 291 F.3d 857, 858 n.* (1st Cir. 2002); Baird v. Rose, 192 F.3d 462, 467 (4th Cir. 1999). Because there is no evidence in the record to suggest that plaintiff is a qualified individual with a disability, let alone that any defendant had the intent to deprive him of his janitorial position that stemmed from discriminatory intent due to any alleged disability, plaintiff fails to establish a prima facie claim under the ADA and the claims against Pszczolkowski, Hill and Griffith should be dismissed. See Bryant v. Madigan, 84 F.3d 246, 249 (7th Cir. 1996)(the ADA is not violated by a prison's simply failing to attend to the medical needs of its disabled prisoners).

## F. Plaintiff's Alleged HIPAA Violation

Plaintiff alleges that defendant Jeniszewski, the Prime Care Medical Administrator, exposed his private medical records without his permission to DOC staff to be "used against" him. (Dkt.# 15 at 17). Further, he alleges that defendant Hill violated his HIPAA privacy rights by "having a copy of plaintiff [sic] medical department evaluation." (Dkt.# 15 at 16).

The Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), codified at 42 U.S.C. §§1320d - 1320d-9, provides protections against disclosure of medical records. However, HIPAA also permits release of such records "in response to a subpoena, discovery request, or other lawful process." 45 C.F.R. §164.512(e)(1)(ii). The right to privacy[6] includes an "individual interest in avoiding disclosure of personal matters." Whalen v. Roe, 429 U.S. 589,

---

[6] See Griswold v. Connecticut, 381 U.S. 479 (1965).

599 (1977). However, this privacy interest must be weighed against the public interest in rehabilitation and in the security of prisons. *Compare* Nixon v. Administrator of General Services, 433 U.S. 425, 457 (1977) *with* Bell v. Wolfish, 441 U.S. 520, 540 (1979).

Here, plaintiff asserts a privacy interest in keeping his medical issues from the DOC staff. The undersigned finds that this issue has little merit. Defendants Jeniszewski and Hill did not violate plaintiff's HIPAA rights to privacy in disclosing or receiving the limited amount of medical information about plaintiff necessary to perform their jobs. Not only did the plaintiff himself put his own medical conditions at issue, subjecting them to disclosure, he disclosed the information himself, by repeatedly proclaimed to DOC staff that he that only had one lung and suffered from COPD.[7] Moreover, the compelling public interests in assuring the security of prisons and promoting effective rehabilitation clearly outweigh the plaintiff's interest in maintaining the confidentiality of his medical conditions. Plaintiff has failed to state a claim against defendants Jeniszewski and Hill and this claim against them should also be dismissed.

## IV.   Recommendation

For the foregoing reasons, the undersigned recommends that the plaintiff's claims against the defendants be **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915A, for the failure to state a claim for which relief may be granted.

**Within fourteen (14) days** after being served with a copy of this Report and Recommendation, **or by March 27, 2013,** any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections shall also be submitted to the United States District Judge. **Failure to timely file objections to this recommendation will result in waiver**

---

[7] Dkt.# 1-2 at 15; Dkt.# 1-2 at 17.

**of the right to appeal from a judgment of this Court based upon such recommendation**.  28

U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th

Cir. 1985);  <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert. denied,</u> 467 U.S. 1208

(1984).

 The Clerk is directed to mail a copy of this Report and Recommendation to the *pro se*

plaintiff by certified mail, return receipt requested, to his last known address as shown on the

docket.

 DATED: March 13, 2013.

       <u>/s/   James E. Seibert_____</u>
       JAMES E. SEIBERT
       UNITED STATES MAGISTRATE JUDGE